

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00189-CR

_____

ERIC DEWAYNE BROWN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from County Criminal Court No. 5
Tarrant County, Texas
Trial Court No. 1733778

---

Before Sudderth, C.J.; Bassel and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Eric Dewayne Brown was convicted of indecent exposure for exposing himself to his adopted, then-17-year-old stepdaughter, A.B. (Amy).[1] *See* Tex. Penal Code Ann. § 21.08(a). Brown challenges his conviction, claiming that the trial court erred by (1) admitting evidence of his prior exposure of himself to Amy; (2) admitting the State's expert testimony; and (3) entering a family violence finding. Because none of these complaints constitute harmful error, we will affirm.

## I. Background

Brown married Amy's mother in 2007, and he adopted Amy soon thereafter, when she was 3 years old.

### A. Exposures

In 2022, when Amy was 17, Brown walked into Amy's bedroom with his penis fully exposed and asked her about her homework while masturbating. The next day, Amy told her mother not only about the exposure that had just occurred but also about a prior incident that had taken place the year before when the family was living in Florida.

---

[1]Because some of the criminal conduct testified to at trial involved sexual offenses committed against the complainant when she was still a minor, we refer to her using a pseudonym. *See* Tex. R. App. P. 9.10(a)(3); *Roberts v. State*, No. 02-18-00146-CR, 2018 WL 3059997, at *1 n.2 (Tex. App.—Fort Worth June 21, 2018, pet. ref'd) (mem. op., not designated for publication).

According to Amy, when she was 16 (and the family was living in Florida), she heard Brown masturbating in the room with her while she was playing video games, and later that night, Brown walked into her bedroom, exposed his penis to her and asked her if she wanted to touch it. He told her not to tell anyone.[2]

Once Amy told her mother about the two exposures, her mother confronted Brown, kicked him out of the house, and initiated divorce proceedings. Brown later admitted to the police that he had exposed himself to Amy in Florida, but he claimed that it had been an accident, and he denied having exposed himself to her in Texas. Nonetheless, based on the Texas incident, Brown was charged with Class B misdemeanor indecent exposure. *See id.*

**B.    Trial**

At trial, Brown characterized the alleged exposure as a "wardrobe malfunction" and denied that he had exposed himself with the intent to gratify his sexual desire. *See id.* (defining offense of indecent exposure to require the "intent to arouse or gratify the sexual desire of any person"). But the jury heard testimony from Amy and her mother that called Brown's denials into question.

---

[2]Amy told a friend about the Florida exposure, but she did not tell her mother until after the Texas incident the following year.

### 1. Testimony[3]

Amy described both of Brown's incidents of exposure for the jury, and she recalled that, after the Florida incident, Brown had apologized to her, acknowledged that his actions had been inappropriate, and asked her not to tell her mother. Amy stated that she "thought it was gonna stop" after Brown's apology, so when Brown exposed himself to her again later in Texas, she was afraid that his behavior "was never gonna end unless [she] told somebody." She testified that his exposure had made her fear that he would escalate into sexual assault or that "he would . . . touch [her] or something," and she had feared that he would do the same thing to her younger sister.

When Amy's mother testified, she described multiple post-disclosure conversations in which Brown had acknowledged that he had "ruined" Amy and had "admit[ted] fault about everything." Several of those conversations were captured in text messages or on security video footage and were provided to the jury. At trial, Brown emphasized the ambiguities in the recorded conversations, noting that in them, he never expressly stated what he was taking responsibility for, and insisting that the conversations with Amy's mother had been about his infidelity rather than about any allegations or admissions of exposure. But in Brown's videotaped police interview—

---

[3]In addition to Amy and her mother, the State introduced testimony from the police investigator involved in the case as well as the expert witness discussed below.

which was played for the jury—he acknowledged that he had admitted the Florida exposure to Amy's mother.

## 2. Evidentiary Rulings

Given Brown's claim that any exposure to Amy had been an isolated and accidental occurrence, he sought to exclude two types of evidence relevant to this appeal.

First, Brown objected to the evidence of his prior exposure to and masturbation in front of Amy in Florida. While he conceded that this evidence qualified for admission under Article 38.371 of the Code of Criminal Procedure, he argued that it was more prejudicial than probative, and he claimed that it was not necessary for the State to prove the isolated Texas exposure incident with which he was charged. The trial court overruled Brown's objection.[4]

Brown also sought to exclude the State's expert testimony, which focused on child abuse and forensic interviews. Brown acknowledged that the witness had expertise in investigating child abuse, forensically interviewing victims, and providing related services to victims' families, but he argued that such expertise was irrelevant to the case and that the expert's testimony would not help the jury. The expert had not interviewed Amy or spoken with her mother, and Brown emphasized that the Texas exposure incident at issue had occurred when Amy was an adult, so (according to

---

[4]The trial court did, however, sustain many of Brown's objections to other extraneous offenses and prior bad acts.

Brown) the expert's testimony was unnecessary and would create confusion. The trial court again overruled Brown's objection.

The expert then proceeded to tell the jury about forensic interviews, red flags indicative of false abuse allegations or coaching, the dynamics of sexual abuse, the tendency of children to delay reporting abuse, grooming behaviors engaged in by abusers, and signs that abuse is escalating. While much of the expert's testimony addressed these topics in the abstract, she also responded to a series of hypotheticals—hypotheticals involving situations strikingly similar to Amy's—to confirm that certain victim inconsistencies were not indicative of falsity, that certain patterns of abuse were common, and that certain abuser behaviors qualified as grooming. She stated that, although she had not interviewed Amy, she had reviewed Amy's police interview and had not noticed any red flags or signs of coaching. And she opined that Amy's description of events indicated that Brown's conduct had been escalating.

### 3. Verdict and Family Violence Finding

After hearing the evidence, the jury found Brown guilty of indecent exposure. *See id.* The trial court sentenced Brown to the maximum punishment, *see id.* § 12.22, probated his sentence for two years, *see* Tex. Code Crim. Proc. Ann. art. 42A.053(f), and over Brown's objection, entered a finding that the offense had involved family violence, *see id.* art. 42.013.

6

## II. Discussion

Brown raises three appellate issues, challenging the trial court's (1) admission of evidence regarding the Florida incident; (2) admission of the State's expert testimony; and (3) entry of the family violence finding.

## A.     Evidence of Florida Incident:  No Abuse of Discretion

First, Brown argues that the trial court abused its discretion by admitting evidence of his extraneous offenses—specifically, his masturbation near and exposure to Amy in Florida—because the evidence was more prejudicial than probative and therefore should have been excluded under Rule of Evidence 403.  *See* Tex. R. Evid. 403.

### 1.     Standard of Review and Governing Law

Evidence of a defendant's extraneous offenses or prior bad acts "is generally admissible if the evidence is relevant to a fact of consequence apart from its tendency to prove character conformity."  *Perkins v. State*, 664 S.W.3d 209, 216 (Tex. Crim. App. 2022); *see* Tex. R. Evid. 404(b).  Such evidence may be admitted, for example, to contextualize "the nature of the relationship between the actor and the alleged victim" in certain cases involving crimes against family members.  Tex. Code Crim. Proc. Ann. art. 38.371(b).  But even if the extraneous offense evidence is admissible for this or another non-character-conformity purpose, it may be excluded under Rule of Evidence 403 if "its probative value is substantially outweighed by a danger

of . . . unfair prejudice."[5]   Tex. R. Evid. 403; *see* Tex. Code Crim. Proc. Ann. art. 38.371(c) (providing that rule authorizing admission of evidence to prove nature of relationship in family-related cases is subject to other evidentiary rules and "does not permit the presentation of character evidence that would otherwise be inadmissible").

When a party lodges a Rule 403 objection to the admission of evidence—as Brown did here—the trial court begins with the presumption that the challenged evidence is admissible. *See Rios v. State*, No. 02-23-00219-CR, 2024 WL 3458076, at *3 (Tex. App.—Fort Worth July 18, 2024, pet. ref'd) (mem. op., not designated for publication).   In ruling on the Rule 403 objection, the court must consider (1) how probative the evidence is; (2) the State's need for the evidence; (3) the time needed to develop the evidence; and (4) the potential of the evidence to impress the jury in some irrational, indelible way.   *See Perkins*, 664 S.W.3d at 216; *Saing v. State*, No. 02-22-00296-CR, 2024 WL 3458074, at *6 (Tex. App.—Fort Worth July 18, 2024, pet. ref'd) (mem. op., not designated for publication); *see also Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006) (presenting six factors and noting that "[e]vidence

[5]Portions of Brown's brief also challenge evidence related to the Florida incident.  Brown claims that—while Rule 403 required the evidence's exclusion even if it was otherwise admissible under Article 38.371—the State failed to establish that Article 38.371 supported the evidence's admission in the first place.  But at trial, Brown conceded that he "can see that [Article 38.371] can apply."  Therefore, to the extent that Brown challenges the admissibility of this evidence under Article 38.371, he failed  to preserve his challenge.  *See* Tex. R. App. P. 33.1(a); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (recognizing that "[w]hether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial").

might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence").

We will not reverse a trial court's Rule 403 ruling absent a clear abuse of discretion, i.e., absent a ruling that is outside the zone of reasonable disagreement. *Perkins*, 664 S.W.3d at 217; *Valadez v. State*, 663 S.W.3d 133, 143 (Tex. Crim. App. 2022); *Rios*, 2024 WL 3458076, at *2; *Saing*, 2024 WL 3458074, at *6.

### 2. No Abuse of Discretion

The trial court's decision to admit evidence of the Florida incident was well within the zone of reasonable disagreement.

#### a. Probative Value

The evidence of the Florida incident directly rebutted Brown's "wardrobe malfunction" theory and made a fact of consequence—Brown's intent to gratify his sexual desire—significantly more probable. *See* Tex. Penal Code Ann. § 21.08 (defining offense of indecent exposure); *Gigliobianco*, 210 S.W.3d at 641 (explaining that evidence's probative value "refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence"). In other words, Brown's characterization of the Texas exposure as an isolated, accidental occurrence was called into question by the fact that he had masturbated in Amy's presence and exposed himself to her on a prior occasion. *See Rios*, 2024 WL 3458076, at *4 (noting in Rule 403 analysis that evidence of prior

9

assaults "had strong probative value because it established the nature of [the complainant's] relationship with [the defendant] and showed a pattern of abuse that spanned for most of their relationship").

### b. Need for Evidence

And for much the same reason, the Florida-incident evidence played a key role in the State's case. *See Nguyen v. State*, No. 02-23-00168-CR, 2024 WL 1451977, at \*7 (Tex. App.—Fort Worth Apr. 4, 2024, pet. ref'd) (mem. op., not designated for publication) (conducting Rule 403 analysis and noting that State needed challenged evidence "to counteract [the defendant's] defense that [the complainant] was a liar who had made up the allegations against him out of anger"). Although the State rebutted Brown's defensive theory in multiple ways, its rebuttal evidence was sprinkled with references to the prior Florida exposure. The text messages exchanged between Brown and Amy's mother, for example, implicitly referenced the year that had passed before Amy reported the Florida exposure—Amy's mother expressed disgust that Brown had told Amy not to tell her, asked if Brown had "just [been] waiting for the day" when his behavior would come to light, and enunciated her realization that "the reason [Amy had not] want[ed] to talk to [Brown or] to be around [him wa]s because [he] made her feel uncomfortable." Had the jury been unaware of the Florida incident, these text messages would not have made sense, as Amy had reported Brown's Texas exposure the day after it occurred.

10

Moreover, Amy's reaction to Brown's exposure would have been difficult to fully explain had the jury not been told of the prior Florida incident. The Florida incident contextualized Amy's perception of Brown's Texas exposure as intentional and fleshed out her fear that Brown's conduct would continue and escalate. *See Rios*, 2024 WL 3458076, at *4 (noting in Rule 403 analysis that evidence of prior assaults "provide[d] context for the seeming randomness of [the defendant's] indicted assaults").

### c. Time to Present

As for the time dedicated to presenting the evidence of the Florida incident, Brown concedes that the challenged evidence "was n[either] immensely time consuming nor repetitious," and the State agrees.

### d. Risk of Improper Use

While evidence of the Florida incident could admittedly have suggested an improper basis for a verdict—given that the Florida exposure occurred while Amy was a minor—"any risk of improper use of the extraneous evidence was lessened by the limiting instruction in the jury charge." *Id.* at *4–5 (noting that evidence is less likely to cause unfair prejudice when "the extraneous offense is no more heinous than the charged offense" while also noting mitigating effect of limiting instruction); *cf. Valadez*, 663 S.W.3d at 146 (conducting Rule 403 analysis, noting lack of limiting instruction, and holding evidence should have been excluded). A limiting instruction was given here, and we presume that the jury followed this instruction. *See Rios*, 2024

11

WL 3458076, at *5; *Nguyen*, 2024 WL 1451977, at *7 (acknowledging in Rule 403 analysis that evidence of a sexual nature involving children "is inherently inflammatory and prejudicial" but presuming jury followed limiting instruction).

### e.    Conclusion

Balancing all of these factors, and being mindful of the need for judicial restraint in appellate review of a Rule 403 ruling, we conclude that the trial court was well within its discretion to admit evidence of the Florida incident.  *See Saing*, 2024 WL 3458074, at *6 (commenting that "[i]f judicial restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal"); *see also Valadez*, 663 S.W.3d at 142–43 (noting that exclusion is required only when there is a "clear disparity" between the probative value and prejudicial effect).

We overrule Brown's first issue.

## B.    Expert Testimony:  No Harm

Brown next argues that the trial court abused its discretion by admitting the State's expert testimony because the expert opined on irrelevant topics and improperly commented on Amy's credibility.[6]  But even assuming that the expert's

---

[6]Brown sounds the alarm regarding what he claims is a broader trend of "unfettered" testimony from this expert in Tarrant County cases involving sexual crimes committed against family members.  *See, e.g.*, *Roberts*, 2018 WL 3059997, at *3 (agreeing with State's concession that trial court erred by admitting testimony from same expert regarding complainant's lack of "red flags for . . . lying").  While his concerns are well taken, harmful error is not present in this case.

testimony should have been excluded, the record demonstrates that it did not influence the jury's verdict.

### 1. Standard of Review and Governing Law

Generally, the erroneous admission of expert testimony requires reversal only if it affects the defendant's substantial rights. *See* Tex. R. App. P. 44.2(b); *Tharp v. State*, No. 03-23-00102-CR, 2024 WL 2309211, at *15 (Tex. App.—Austin May 22, 2024, no pet.) (analyzing harm from erroneous admission of expert testimony commenting on witness's truthfulness); *Roberts*, 2018 WL 3059997, at *3 (similar). A substantial right is affected when the erroneously admitted testimony has a substantial and injurious effect or influence on the jury's verdict; it is not affected when the improperly admitted testimony has but a slight effect on the verdict. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Roberts*, 2018 WL 3059997, at *3.

In analyzing whether the erroneous admission of expert testimony affected a defendant's substantial rights, we consider (among other things) the strength or weakness of the expert's conclusions, whether the jury heard similar evidence from another source, the strength of the evidence of the defendant's guilt, and whether the State's arguments directed the jury's attention to the expert's testimony. *See Coble*, 330 S.W.3d at 286–87; *Roberts*, 2018 WL 3059997, at *3.

### 2. No Harm

The State's expert testimony did not substantially or injuriously influence the jury's verdict.

### a. Strength or Weakness of Expert's Statements

Many of the reasons why Brown labels the testimony as irrelevant and unhelpful are precisely what diminished its influence. Brown complains, for example, of the expert's description of forensic interview procedures, noting that Amy was not forensically interviewed so the testimony was irrelevant and should have been excluded. But given that Amy was not forensically interviewed, we fail to see how the expert's description of forensic interview procedures could have significantly altered the verdict.

Likewise, we fail to see how the description of forensic interviews could have had an injurious effect. To the contrary, because the expert contrasted the "neutral, non-leading" forensic interview process with that of a typical police interview, such testimony, if anything, had the potential to create doubt in the jury's mind as to the reliability of Amy's statements to the police. Brown has not explained how the expert's testimony about protective procedures that were not utilized in Amy's case could have harmed him.

Brown also complains that the State's expert was permitted to discuss the tendency among children to delay their disclosures of abuse. Brown asserts that this testimony was irrelevant because Amy "told her mother [about the Texas exposure] the next morning." But to the extent that the expert's discussion of delayed outcries did not apply to the Texas exposure incident, such testimony, if anything, again played in Brown's favor. By highlighting that Amy's prompt reporting of the Texas exposure

14

deviated from the norm, the expert's discussion of delayed reporting arguably called her disclosure into question. So, again, Brown fails to articulate how the challenged testimony could have injuriously influenced the verdict.

### b. Similar Evidence from Other Sources

Brown's complaint that the expert "supplanted [the jury's] opinion of guilt" is also unpersuasive. Brown complains that the expert should not have been permitted to opine that Amy appeared to have a "low level of suggestibility" and that she showed no signs of coaching or red flags. But even assuming that the expert's comments amounted to improper opinions on Amy's credibility, her opinions were not particularly strong, as she admitted that she had not interviewed Amy and had merely reviewed Amy's police interview. The jury, meanwhile, having heard live testimony directly from Amy, had little reason to supplant its own firsthand credibility assessment with the expert's secondhand analysis. *See Schutz v. State*, 63 S.W.3d 442, 445 (Tex. Crim. App. 2001) (noting that if expert directly comments on complainant's credibility it presents danger that "the jury could . . . allow[] that testimony to supplant its decision"); *Schutz v. State*, 957 S.W.2d 52, 70–71 (Tex. Crim. App. 1997) (explaining that opinion on ultimate credibility issue is unhelpful in part because "the jury is just as capable as the expert of drawing the [credibility] conclusions"); *Roberts*, 2018 WL 3059997, at *4 (holding that expert testimony regarding complainant's lack of red flags was harmless when the complainant testified so the jury "had the opportunity to assess [her] credibility and demeanor for themselves").

15

Similarly, while Brown expresses outrage at the expert's confirmation that Amy's report of events showed concerning "signs of escalation," the testimony merely reiterated what Amy had already stated. Amy testified that she had feared Brown's conduct would escalate and "was never gonna end unless [she] told somebody." It is unlikely, then, that the expert's transmission of Amy's escalation concerns substantially influenced the verdict.

### c. Strength of Evidence of Guilt

Amy's testimony alone was sufficient to support a finding of guilt. Tex. Code Crim. Proc. Ann. art. 38.07(a) (providing that "[a] conviction under Chapter 21, . . . Penal Code, is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person . . . within one year"). Amy fully described the Texas exposure for the jury and explained why she believed it to have been an intentional sexual act rather than a mere accident. *Cf. Roberts*, 2018 WL 3059997, at *4 (holding that expert testimony regarding complainant's lack of red flags was harmless when complainant "testified at length and in detail about [the defendant's] abuse").

And Amy's testimony, though sufficient, was not the only evidence of Brown's guilt. *See id.* (holding that expert testimony regarding complainant's lack of red flags was harmless when "the evidence of [the defendant's] guilt was strong"). Not only did her mother's description of Brown's behavior reinforce the idea that his Texas exposure had not been accidental, but her mother's videotaped and text-message

16

conversations with Brown also supported such a conclusion, as did Brown's police interview admitting to the Florida exposure.

At most, certain aspects of the expert's testimony may have explained or contextualized some of the events alleged to have occurred, but at the end of the day, the jury's verdict came down to whether it believed Amy's live testimony. Although Brown contends that the expert's references to "the horrors of child sexual abuse" served "to inflame the jury,"[7] such testimony would have fallen on deaf ears if the jury had doubted Amy's claims that Brown had, in fact, exposed himself to her in the first place.

### d.    State's References to Expert in Arguments

The same goes for the State's handful of references to the expert in its closing arguments. *See id.* (holding that expert testimony regarding complainant's lack of red flags was harmless when the State's references to the expert's testimony "comprised only a small part of the State's overall argument"). The State referenced the expert's having "talked about grooming" behaviors and having "called [Brown's exposure] child abuse," but these labels were meaningless unless the jury found Amy's testimony credible.

---

[7]Brown does not challenge the testimony's admission under Rule 403.

### e. Conclusion

The record provides a fair assurance that the expert's testimony, assuming it was erroneously admitted, did not substantially and injuriously influence the jury's verdict. We overrule Brown's second issue.

## C. Family Violence Finding: No Error

In his final issue, Brown argues that the trial court erred by entering a family violence finding under Article 42.013 of the Code of Criminal Procedure because there was no evidence that his Texas exposure involved any violence.

### 1. Standard of Review and Governing Law

Article 42.013 requires a trial court to make a family violence finding "if the court determines that the offense involved family violence." Tex. Code Crim. Proc. Ann. art. 42.013; *see Butler v. State*, 189 S.W.3d 299, 302 (Tex. Crim. App. 2006). To decide whether sufficient evidence supports the factual basis for a trial court's entry of a family violence finding, we view the record in a light most favorable to the finding and ask whether any rational factfinder could have concluded that the offense involved family violence.[8] *See Couthren v. State*, 571 S.W.3d 786, 789 (Tex. Crim. App.

---

[8] Because the burden of proof for the family violence finding is not dispositive and the parties do not address it in their briefs, we assume without deciding that the State was required to prove the factual basis for the finding beyond a reasonable doubt. *See Word v. State*, 206 S.W.3d 646, 653 & n.15 (Tex. Crim. App. 2006) (leaving unanswered whether "the jury's family[ ]violence finding by a preponderance of the evidence [wa]s proper," holding that the finding's ability to enhance a future conviction was not ripe, but noting that a deadly weapon finding "must be proved beyond [a] reasonable doubt"); *Meinzer v. State*, No. 02-23-00005-CR, 2024 WL

2019) (reviewing sufficiency of deadly weapon finding); *see also Gomez v. State*, No. 2-09-086-CR, 2010 WL 1730832, at *1 (Tex. App.—Fort Worth Apr. 29, 2010, pet. ref'd) (mem. op., not designated for publication) (reviewing sufficiency of the evidence to support finding that prior conviction involved family violence); *Goodwin v. State*, 91 S.W.3d 912, 919–20 (Tex. App.—Fort Worth 2002, no pet.) (similar).

As relevant here, "family violence" is defined as "an act . . . against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault." Tex. Fam. Code Ann. § 71.004(1). "Assault," in turn, includes a person "intentionally or knowingly caus[ing] physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." Tex. Penal Code Ann. § 22.01(a)(3). And "sexual assault" occurs when a person "intentionally or knowingly . . . (A) causes the penetration of the anus or sexual organ of another person by any means, without that person's consent; (B) causes the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent; or (C) causes the sexual organ of another person, without that

---

1100478, at *7–8 (Tex. App.—Fort Worth Mar. 14, 2024, no pet.) (mem. op., not designated for publication) (recognizing that the Court of Criminal Appeals has not weighed in on the burden of proof for an Article 42.013 family violence finding and declining to resolve the issue).

person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor." *Id.* § 22.011(a)(1).

### 2. No Error

Here, there was sufficient evidence that Brown's Texas exposure posed an implied threat to Amy. Amy testified that Brown's exposure made her worry that he would escalate to sexual assault or to "touch[ing her] or something." This fear was supported and clarified by Amy's description of the prior Florida incident, in which Brown had not only exposed himself to her but also invited her to touch his penis. Such testimony allowed the trial court to rationally conclude that Brown's Texas exposure presented an implied "threat" to Amy that "reasonably place[d her] . . . in fear of imminent . . . assault[] or sexual assault."[9] *See* Tex. Fam. Code Ann. § 71.004(1); Tex. Penal Code Ann. §§ 22.01(a)(3), 22.011(1). This was sufficient to support the factual basis for the trial court's family violence finding.

We overrule Brown's third issue.

---

[9]To the extent that Brown also challenges the evidence that he had the requisite mens rea for the threatened act, the trial court could have determined that Brown knew or should have known that touching Amy with his penis would be offensive or provocative given Amy's testimony that, after the Florida incident, Brown had acknowledged the inappropriateness of his actions. *See* Tex. Fam. Code Ann. § 71.004(1).

20

# III.  Conclusion

Having overruled all of Brown's issues, we affirm the trial court's judgment.

*See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  October 17, 2024